**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| ESURANCE PROPERTY & CASUALTY INSURANCE CO., | ) ) ) Case No. 5:19-cv-02849 |
| Plaintiff, | ) ) Judge J. Philip Calabrese ) ) |
| v. | ) ) |
| GINA-MARIE KYLE, | ) ) |
| Defendant. | ) ) ) |

**OPINION AND ORDER**

This action arises from water damage to Defendant Gina-Marie Kyle's house, which she insured through Plaintiff Esurance Property & Casualty Insurance Company. Plaintiff seeks a declaration that there is no coverage under the policy and moves for summary judgment to determine its coverage obligations. (ECF No. 64; ECF No. 65.) For the following reasons, the Court **DENIES** Plaintiff's motion for summary judgment.

**STATEMENT OF FACTS**

At this stage of the proceedings, the record establishes the following facts, which the Court construes in the light most favorable to Defendant as the non-movant.

**A. Background**

Defendant Gina-Marie Kyle built and moved into a house located at 955 East Boulevard in Aurora, Ohio in 1995. (ECF No. 64-6, PageID #659; ECF No. 64-2, PageID #603.) She purchased the property with a loan from the United States Rural

Housing Service, which maintained a mortgage on the property. (ECF No. 64-2, PageID #603–09.)

In 2017, Ms. Kyle stopped making payments on her mortgage. (ECF No. 64-6, PageID #679–80.) At that time, Ms. Kyle was caring for a sister, and her daughter suffered an accident—both of which contributed to her financial hardship. (*Id.*, PageID #643–44 & #679.) She researched programs to help her keep the property. (*Id.*, PageID #681.) In June 2018, the Rural Housing Service initiated foreclosure proceedings on the property, and a local court entered a decree of foreclosure in February 2019. (ECF No. 64-2; ECF No. 64-3.) The decree "forever cut-off, barred and foreclosed" Ms. Kyle from asserting any interest in the property unless she exercised her equitable right of redemption within three days. (ECF No. 64-3, PageID #618.) She did not, and the court entered an order to sell that same month. (ECF No. 64-4.) Ms. Kyle's lender did not initiate ejectment proceedings against her, and she retained access to the property while the foreclosure was pending. (ECF No. 64-6, PageID #693; *see also United States v. Kyle*, Portage C.P. No. 2018-cv-00533 (June 28, 2018).)

In August 2018, while foreclosure proceedings were pending but before entry of the foreclosure decree in February 2019, Ms. Kyle traveled to Florida to visit her sister. (ECF No. 64-6, PageID #646–48.) During the visit, Ms. Kyle interviewed for a job with a Florida company. (*Id.*) She secured the position and signed a one-year lease in Clearwater, Florida beginning in October 2018. (*Id.*, PageID #650–48.) Ms. Kyle testified that short-term leases were more expensive than a one-year lease.

(*Id.*, PageID #650.) She left most of her personal possessions at the property in Aurora, Ohio and left her dog in Ohio with her cousin. (*Id.*, PageID #657 & #701–02.) Ms. Kyle testified that she was not sure she wanted to stay in Florida and that she believed she could return to her old job in Ohio if she chose. (*Id.*, PageID #648–51.) She maintained an Ohio driver's license and vehicle registration and remained registered to vote in Ohio until September 2020. (*Id.*, PageID #652–53.) She also continued to receive mail at her house in Aurora. (*Id.*, PageID #675.)

B.  **The Policy**

On or about March 7, 2017, Esurance issued Ms. Kyle a homeowner's insurance policy for the property in Aurora, Ohio. ([ECF No. 64-1](), PageID #471.) Ms. Kyle timely renewed the policy twice, and it expired on March 7, 2020. (*Id.*, PageID #542 & #580.) The policy included dwelling protection for 955 East Boulevard, the "residence premises," and personal property protection. (*Id.*, PageID #472–75.) The policy defined the residence premises as "the dwelling, other structures and land located at the address" identified in the policy. (*Id.*, PageID #482.) The dwelling means "the single-family building structure . . . *where you reside* and which is principally used as a private residence." (*Id.*, PageID #481 (emphasis added).)

Under the policy, Ms. Kyle was to inform Esurance "of any change in title, use or occupancy of the residence premises." (*Id.*, PageID #483.) The policy covered "sudden and accidental direct physical loss" to the covered property, except as limited or excluded in the policy. (*Id.*, PageID #486.) Among those limits and exclusions was "freezing of plumbing . . . or discharge, leakage or overflow from within [plumbing],

3

caused by freezing, while the building structure is vacant, unoccupied, or being constructed, unless you have used reasonable care to maintain heat." (*Id.*, PageID #490.) Under the policy, Esurance did not cover loss caused by Ms. Kyle's "failure . . . to take all reasonable steps to save and preserve property when the property is endangered" by an otherwise covered cause of loss. (*Id.*, PageID #490.) These exclusions also applied to personal property. (*Id.*, PageID #494 & #497.)

The policy limited Esurance's liability to Ms. Kyle's insurable interest in the property. (*Id.*, PageID #501.) Also under the policy, Esurance did not accept responsibility for property Ms. Kyle abandoned, but the residence premises could "be vacant or unoccupied for any length of time, except where a time limit is indicated in this policy." (*Id.*, PageID #504.) None of the policy provisions relevant to this dispute included such a time limit.

### C. Winter 2018–19 and Water Damage to the Property

While she was in Florida, Ms. Kyle asked several people to check on the property, including her brother Brian Kyle, her sister Dana Vercella, and her neighbor Wayne Hawkins. ([ECF No. 64-6](), PageID #656.) However, Ms. Kyle did not insulate the pipes, drain the water lines, or take other steps to winterize the property. (*Id.*, PageID #658 & #664–65.) She testified that she changed the batteries in the thermostat but did not have the furnace or other equipment serviced before she left. (*Id.*, PageID #656 & #662–64.) She did not leave written instructions about how to look after the property for her siblings or Hawkins. (*Id.*, PageID #672.)

Both Ms. Kyle's siblings and neighbor report visiting the property between October 2018 and March 2019. Kyle testified that he entered the house to check on

4

it every other week. (ECF No. 66-1, PageID #759–60.) He also testified that he ran the faucets three of four times and turned the heat up to approximately 62 degrees in November 2018. (*Id.*, PageID #761–63.) Every time Kyle visited the house, it felt as if the heat was on. (*Id.*, PageID #764 & #806–07.) Vercella also visited the house to collect her sister's mail. (ECF No. 66-3, PageID #792–94.) She testified that it was never noticeably cold in the house. (*Id.*, PageID #798–99.) Also, she turned the heat up in the house in November. (*Id.*, PageID #806.) Ms. Kyle herself visited the property on or about February 23, 2019—a few days after the foreclosure decree—and stayed the night there. (ECF No. 64-6, PageID #693.) Ms. Kyle testified that when she visited the property it was warm inside and the furnace was working. (*Id.*, PageID #697–98.) She testified that when she left the next day the thermostat was set to approximately 68 degrees. (*Id.*, PageID #700.)

On March 17, 2019, Hawkins entered the home and discovered a significant amount of water damage. (*Id.*, PageID #707–08.) He informed Ms. Kyle about the damage, and she called the authorities to come turn off the water. (*Id.*, PageID #708.) On March 21, an inspector from a company called American Leak Detection, which Esurance retained, determined that "[t]here was damage all throughout the house" and "[w]hat looks like a freeze break was found on the hot water line, going into the bathtub." (ECF No. 64-7, PageID #718 & #722.) Approximately six weeks later, a technician from a local plumbing firm also inspected the property and determined that the furnace control board contained an extreme amount of moisture, the batteries that operated the hot water tank were dead, and the thermostat was

5

inoperable. (ECF No. 64-8, PageID #723.) That same day, another technician from EFI Global inspected the property on behalf of Esurance to determine "the operating condition" of the furnace. (ECF No. 64-9, PageID #725.) This inspector also reported that the furnace and thermostat were not working and that there was "no way to determine when these failures occurred." (*Id.*, PageID #726.)

On October 27, 2020, while this action was pending, the property sold at auction. (ECF No. 64-5, PageID #628.) Ms. Kyle now resides in Florida. (ECF No. 64-6, PageID #652; ECF No. 70.)

## STATEMENT OF THE CASE

On December 9, 2019, Plaintiff filed this lawsuit seeking a declaration that Defendant was not entitled to insurance coverage for the water damage at 955 East Boulevard. (ECF No. 1.) Defendant answered on April 3, 2020 (ECF No. 8), and after retaining counsel filed an amended answer and counterclaims on June 3, 2020. (ECF No. 19.) On February 10, 2021, the Court stayed discovery on Defendant's counterclaims pending resolution of the issue of coverage. (ECF No. 58.)

Plaintiff moves for summary judgment on "the coverage issues set forth in the Complaint." (ECF No. 64; ECF No. 65.) Plaintiff's memorandum in support also addresses Defendant's counterclaims. Because the Court stayed discovery on those claims and because Plaintiff's motion is specific to the coverage issues, the Court considers only whether summary judgment is appropriate on Plaintiff's declaratory judgment claims.

## ANALYSIS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court must view evidence in the light most favorable to the non-moving party. *Kirilenko-Ison v. Board of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

On a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the claim or defense at issue. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 & n.12 (6th Cir. 1989); *Chappell v. City of Cleveland*, 584 F. Supp. 2d 974, 988 (N.D. Ohio 2008). After discovery, summary judgment is appropriate if the non-moving party fails to establish "an element essential to that party's case and upon which that party will bear the burden of proof at trial." *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

To determine whether a genuine dispute about material facts exists, it is not the Court's duty to search the record; instead, the parties must bring those facts to the Court's attention. *See Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). "The party seeking summary judgment has the initial burden of informing the court of the basis for its motion" and identifying the portions of the record "which

7

it believes demonstrate the absence of a genuine issue of material fact." *Tokmenko*, 488 F. Supp. 3d at 576 (citing *Celotex Corp.*, 477 U.S. at 322). Then, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*, 475 U.S. at 586.

On summary judgment, the central inquiry "determin[es] whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. Generally, a district court "will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter." *Kermavner v. Wyla, Inc.*, 250 F. Supp. 3d 325, 329 (N.D. Ohio 2017) (citing *Anderson*, 477 U.S. at 249). A district court only examines "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

If a genuine dispute exists, meaning "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is not appropriate. *Tokmenko*, 488 F. Supp. 3d at 576 (citing *Anderson*, 477 U.S. at 250). However, if "the evidence is merely colorable or is not significantly probative," summary judgment for the movant is proper. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported

8

motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48).

**I.     Objections**

Rule 56(c)(2) governs objections to the admissibility of evidence offered to support a factual assertion in a motion for summary judgment.  Under this Rule, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Under Rule 56(c)(2), the Court will disregard any inadmissible portions of the evidence at issue.  In evaluating an objection under Rule 56(c)(2), the Court "should disregard [inadmissible evidence] rather than striking it from the record." *Stephenson v. Family Sols. of Ohio, Inc.*, No. 1:18-cv-2017, 2021 WL 795551, *5 (N.D. Ohio Mar. 3, 2021) (cleaned up).  "It is well settled that only admissible evidence may be considered by the trial court ruling on a motion for summary judgment." *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (cleaned up).

**I.A.     Objections to Inspection Reports**

Defendant argues that the Court should not consider the reports from the two companies (American Leak and EFI Global) that Esurance retained because those reports are not admissible evidence under Rule 56(c)(1).  Notably, Plaintiff does not submit either as expert evidence.  Instead, inspectors who observed the property shortly after Hawkins (Ms. Kyle's neighbor) discovered the water damage prepared these reports and took the photos contained in them.  American Leak's technician inspected the property just four days after Hawkins discovered the damage, and EFI Global's technician did so approximately six weeks later.  Defendant does not dispute

9

the authenticity of either report. Indeed, Defendant herself filed the American Leak report as an attachment to her initial answer in this suit. (ECF No. 8-2.) On the assumption that Plaintiff can authenticate these reports, the Court will consider them on summary judgment and, therefore, overrules the objections to them.

### I.B. Objection to Expert Report

Defendant objects to the expert report of Ronald Natoli, which Plaintiff submitted in support of its motion for summary judgment, arguing that it is inadmissible because Plaintiff did not submit the report with an affidavit. (ECF No. 67, PageID #831.) That objection prompted Defendant to provide the affidavit. (ECF No. 68-1.) Although that submission moots the specific objection, the Court has a gatekeeping obligation under Rule 702.

Rule 702 "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). At bottom, this gatekeeping function ensures that expert evidence rests on a reliable foundation and is relevant to the task at hand. *Daubert*, 509 U.S. at 589, 597. Additionally, the Court must find that: (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) "the testimony is based on sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The Court's gatekeeping role applies to all

10

testimony based on technical or specialized knowledge, not just scientific evidence. *Kumho Tire Co.*, 526 U.S. at 147.

Natoli is qualified as a mechanical engineer with experience in heating and plumbing systems. (ECF No. 68-1, PageID #848.) He prepared his expert report by reviewing Ms. Kyle's utility bills, her deposition and affidavit, the EFI Global and American Leak reports, the local plumbing firm's report, the insurance policy at issue, Ms. Kyle's bank statements and Florida lease, and local weather data from the relevant time period. (*Id.*, PageID #849.) However, Natoli did not consider the depositions of the handful of individuals who were present in the house during the relevant time period and have firsthand knowledge of the temperature and condition of the property. (ECF No. 66-1; ECF No. 66-3.) Because he disregarded this material evidence, which is not voluminous or burdensome to review, the Court cannot say that Natoli's opinions are "based on sufficient facts or data" or that he reliably applied his methodology to reach his opinions about the cause of the water damage to the property.

## II.   Coverage

Plaintiff seeks a declaration that there is no coverage under the policy for three reasons: (1) Ms. Kyle did not have an insurable interest in the property, on which her lender had foreclosed; (2) Ms. Kyle moved to Florida and no longer resided at the property when the damage occurred; and (3) Ms. Kyle failed to take reasonable care to maintain heat at the property while she was in Florida. (ECF No. 65.)

11

### II.A. Insurable Interest in the Property

Plaintiff argues that Defendant cannot claim coverage under the policy because she no longer had an insurable interest in the property at 955 East Boulevard when the water damage occurred. According to Plaintiff, the foreclosure decree eliminated Ms. Kyle's insurable interest. (ECF No. 65, PageID #741–43; ECF No. 68, PageID #837–39.) The policy expressly limits Esurance's liability to Ms. Kyle's insurable interest. (ECF No. 64-1, PageID #501.)

Under Ohio law, a decree of foreclosure does not eliminate a mortgagor's interest in the mortgaged property. "In Ohio, a mortgagor's right to redeem is 'absolute and may be validly exercised at any time prior to the confirmation of sale.'" *Hausman v. Dayton*, 73 Ohio St. 3d 671, 676, 1995-Ohio-277, 653 N.E.2d 1190 (1995) (quoting *Women's Fed. Sav. Bank v. Pappadakes*, 38 Ohio St. 3d 143, 146, 527 N.E.2d 792 (1988)); *Levin v. Carney*, 161 Ohio St. 513, 520, 120 N.E.2d 92 (1954). As Plaintiff points out, mortgagors also have an equitable right of redemption after a court enters a decree of foreclosure. (ECF No. 65, PageID #741–43; ECF No. 68, PageID #837–40.) Generally, Ohio courts set that redemption period at three days. *Hausman*, 73 Ohio St. 3d at 676. However, a mortgagor's absolute right of redemption arises under Section 2329.33 of the Ohio Revised Code, which provides that, "at any time before the confirmation [of sale], the debtor may redeem [the property] from sale by depositing in the hands of the clerk . . . the amount of the judgment or decree upon which such lands were sold." Ohio Rev. Code § 2329.33. Mortgagors can waive this statutory right of redemption by agreement with their mortgage company. *See Hausman*, 73 Ohio St. 3d at 677.

12

It is undisputed that the Rural Housing Service foreclosed on the property at 955 East Boulevard. The Rural Housing Service initiated foreclosure proceedings against Ms. Kyle in June 2018, and the State court entered a decree of foreclosure in February 2019, before the water damage occurred. (ECF No. 64-2; ECF No. 64-3.) That decree included a three-day equitable right of redemption, which Ms. Kyle did not exercise. (ECF No. 64-3, PageID #618.) However, the property did not sell until October 2020, after the damage. (ECF No. 64-5, PageID #628.) Under Ohio law, Ms. Kyle retained her absolute statutory right to redeem until that time, unless she agreed with the Rural Housing Service to waive it. Plaintiff points to no evidence in the record that Ms. Kyle waived this right. Therefore, the record does not support a conclusion on summary judgment that Ms. Kyle forfeited her insurable interest before the water damage occurred.

Similarly, the foreclosure did not affect Defendant's interest in the personal property that the policy covered. The policy included protection up to $157,800 for personal property. (ECF No. 64-1, PageID #475; ECF No. 1, PageID #2.) The water damaged many of Ms. Kyle's personal possessions, which she left in the house when she went to Florida in October 2018. (ECF No. 64-6, PageID #701–02.) Ms. Kyle maintained an insurable interest in her personal property that remained in the house after the decree of foreclosure.

For these reasons, the Court concludes that the record does not support an agreement or waiver of the mortgagor's statutory right to redeem such that

Defendant had an insurable interest in the real property at 955 East Boulevard and the personal property in the house when the water damage occurred.

**II.B. Residence**

Plaintiff argues that there is no coverage under the policy because Defendant did not reside at 955 East Boulevard as of October 2018. (ECF No. 65, PageID #743–44; ECF No. 68, PageID #841.) According to Plaintiff, Ms. Kyle abandoned the property and moved to Florida permanently. (*Id.*) Under the policy, Esurance only provided dwelling protection coverage for "the single-family building structure . . . *where you reside* and which is principally used as a private residence." (ECF No. 64-1, PageID #481 (emphasis added).) The policy does not define the term reside.

Ohio courts recognize that the term "reside" is often ambiguous in insurance contracts. *See Nationwide Prop. Cas. Ins. Co. v. Kavanaugh*, No. 25747, 2013-Ohio-4730, ¶ 15 (Ohio Ct. App.); *Hicks v. Mennonite Mut. Ins. Co.*, No. 10-CA-17, 2011-Ohio-499, ¶¶ 43–45 (Ohio Ct. App.); *Prudential Prop. & Cas. Ins. Co. v. Koby*, 124 Ohio App. 3d 174, 177, 705 N.E.2d 748 (Ohio Ct. App. 1997). Black's Law Dictionary defines residence as "[th]e act or fact of living in a given place for some time" and "[t]he place where one actually lives, as distinguished from a domicile." *Residence*, Black's Law Dictionary (11th ed. 2019). "A person . . . may have more than one residence at a time but only one domicile." *Id.*

Determining residence presents a fact-intensive inquiry. Ohio courts consider: whether utilities are active at the property; whether the insured person maintains a regular presence at the property; whether the property is the address on the insured

individual's bank statements, license, and other accounts; whether the insured person is registered to vote in the State where the property is located; where the insured person pays taxes; whether the insured person kept personal items and mementos at the property; whether someone other than the insured is living at the property and the insured's relationship to that person; and the insured person's intent to remain elsewhere. *See Kavanaugh*, 2013-Ohio-4730, ¶¶ 20 & 34; *Koby*, 124 Ohio App. 3d at 179–80; *Hicks*, 2011-Ohio-499, ¶ 33; *Whitaker v. Grange Mut. Cas. Co.*, No. 20474, 2004-Ohio-5270, ¶ 15 (Ohio Ct. App.).

For example, in *Whitaker*, the insured parties were not living at the property and allowed third parties to live there instead. The Whitakers rented the property to an unrelated family who paid $450 per month in rent and paid the utility bills. *Whitaker*, 2004-Ohio-5270, ¶¶ 1, 15. On these facts, the court granted summary judgment in favor of the insurance company. *Id.*, ¶ 18; *see also Kavanaugh*, 2013-Ohio-4730, ¶¶ 2, 18–20 & 34 (ruling that insured did not reside at a property she rented to her ex-fiancé's nephews and where she did not store any personal belongings).

In contrast, *Hicks* involved a man who owned his deceased mother's home and allowed his sister to live there rent-free. *Hicks*, 2011-Ohio-499, ¶ 33. Previously, he lived in the home and still maintained a daily presence there. *Id.*, ¶¶ 6, 33. Genuine issues of material fact regarding where Hicks resided when the loss occurred foreclosed summary judgment. *Id.*, ¶ 42; s*ee also Koby*, 124 Ohio App. 3d at 179–80 (ruling that military servicemember had two residences: he lived in Texas but

continued to pay Ohio taxes, voted in Ohio, maintained an Ohio driver's license, and used an Ohio address as his permanent address).

Ms. Kyle's movements from October 2018 to March 2019 are not a matter of significant dispute. Rather, the parties invite the Court to draw opposing inferences from those facts and dispute Ms. Kyle's intent when she went to Florida in October 2018. (ECF No. 64-6, PageID #648–51; ECF No. 67, PageID #825–26; ECF No. 65, PageID #744.) Plaintiff argues that Defendant abandoned her residence at 955 East Boulevard because she signed a year-long lease in Florida, took a job there, and was behind on her mortgage. (ECF No. 65, PageID #744; ECF No. 68, PageID #841; ECF No. 64-6, PageID #650 & 679–80; ECF No. 64-2; ECF No. 64-3.) However, Defendant testified that she was not sure she would stay in Florida and did not abandon her residence. (ECF No. 64-6, Page ID #648–51.) Also, she testified that she left her personal possessions at the property, continued to receive mail there, maintained her voter registration in Ohio, kept her Ohio driver's license, and paid taxes in Ohio. (*Id.*, PageID #701–02, #652–53 & #675.)

Ohio courts consider each of these factors in determining residence, and all point to permitting a finding that Ms. Kyle maintained 955 East Boulevard as her residence even after she began living in Florida. Further, Ms. Kyle testified that she was behind on her mortgage for personal reasons, not because she intended to abandon the property, and that she was considering ways to work with her lender to keep it. (*Id.*, PageID #679–81.) Unlike the property owners in *Whitaker*, she did not rent the property out to anyone else. (*Id.*, PageID #675.)

16

Finally, Plaintiff cites an Ohio Supreme Court case from 1885 for the proposition that a vacancy condition that declares a policy to be "void if the [insured building is] 'vacant or left unoccupied' is absolute." *Farmers' Ins. Co. v. Wells*, 42 Ohio St. 519, 521, 13 W.L.B. 258 (1885). But there is no such condition in the Esurance policy at issue. Instead, Esurance disclaimed responsibility for property Ms. Kyle abandoned. (ECF No. 64-1, PageID #504.) However, the policy expressly allowed Ms. Kyle to leave the property "vacant or unoccupied for any length of time." (*Id.*) As discussed below, under the policy Ms. Kyle had to take reasonable steps to maintain heat at the property when it was vacant or unoccupied, but there is no absolute vacancy condition in the policy. (ECF No. 64-1, PageID #490 & #494.)

Viewing the facts in Defendant's favor as the non-movant, as the Court must in the current procedural posture, Plaintiff is not entitled to summary judgment on the issue of residence. A reasonable jury could find that Ms. Kyle resided at 955 East Boulevard at the relevant times. The record is not so one-sided that the Court can conclude as a matter of law that Defendant did not reside at 955 East Boulevard when the water damage occurred.

### II.C. Reasonable Care

Plaintiff also argues that there is no coverage under the policy because Defendant failed to take reasonable steps to maintain heat at the property. (ECF No. 65, PageID #745–48; ECF No. 68, PageID #841–44.) Under the policy, Esurance does not cover loss from "[f]reezing of plumbing . . . or discharge, leakage or overflow from within [plumbing], caused by freezing, while the building structure is vacant, unoccupied or being constructed, *unless you have used reasonable care to maintain*

17

*heat.*" (ECF No. 64-1, PageID #490 (emphasis added).)  This exclusion also applies to personal property.  (*Id.*, PageID #494.)

Again, the record is not so one-sided that Plaintiff is entitled to judgment as a matter of law on the basis of this exclusion.  Construing the record in Defendant's favor, whether Ms. Kyle exercised reasonable care presents genuine disputes of material fact for the jury.  Among other things, a reasonable jury could credit the fact that Ms. Kyle had her siblings and a neighbor check on the property regularly and changed the batteries in her thermostat before going to Florida as evidence of reasonable care.  (ECF No. 64-6, PageID #656 & #658.)  Additionally, the jury could use the temperature in the house a few weeks before the loss as evidence of Ms. Kyle's reasonable care.  (*Id.*, PageID #697–98.)  A jury might not so find, but the record would permit a jury to do so.

Plaintiff points to *Caldwell v. Allstate Property Insurance Casualty Co.*, No. 1:18-cv-68, 2018 WL 5278956 (N.D. Ohio Oct. 24, 2018), to argue otherwise.  There, the plaintiff owned property in Cleveland, but split time between that property and his mother's house in Rocky River, a suburb not far away.  *Id.* at *1.  He testified that the thermostat at his Cleveland property was always set to 65 degrees and that the house was never cold when he was there during the winter months.  *Id.*  However, on January 22, 2017, neighbors noticed water flowing inside the property causing damage.  *Id.*  The defendant insurance company presented evidence that the plaintiff's gas bill reflected almost no usage for the months preceding the water damage.  *Id.* at *2.  Like Ms. Kyle, the plaintiff in *Caldwell* did not take steps to

winterize the house. Nonetheless, the court ruled that summary judgment was not appropriate on the issue of reasonable care because the plaintiff testified that the furnace was working and the house was warm on December 10, 2016—some five weeks before the damage was discovered and eight days before the insurance company contended the pipes froze, causing the water damage at issue there. *Id.* at *8.

Plaintiff argues that *Caldwell* is distinguishable because the insured in that case visited the property regularly and checked on the furnace and thermostat. (ECF No. 65, PageID #747.) This effort to distinguish *Caldwell* is unconvincing. Caldwell himself indicated that he was not at the home for nearly five weeks before neighbors discovered the water damage. *Caldwell*, 2018 WL 5278956, at *2. Ms. Kyle visited 955 East Boulevard closer in time to the discovery of the water damage in *Caldwell*—approximately three weeks—and testified that it was warm in the house at that time. (ECF No. 64-6, PageID #697–98.)

Also, in *Caldwell*, the insurance company wholly failed to address testimony that the furnace was set to 65 degrees and the house was warm. *Caldwell*, 2018 WL 5278956, at *8. Ms. Kyle and her siblings provide nearly identical testimony here. (ECF No. 66-1, PageID #764 & #806–07; ECF No. 66-3, PageID #798–99.) Plaintiff fails to address that evidence. Even if Rule 702 allowed the consideration of Natoli's expert report, his opinions failed to consider that evidence too. (ECF No. 68-1, PageID #849.) Nor do Natoli's opinions, if considered, change the conclusion that the record presents a genuine dispute of fact on the issue of reasonable care. His opinions

relate to the cause of the water damage and actions Ms. Kyle might have taken that would have prevented the damage. (*Id.*, PageID #851–52.) Though the product of an unreliable methodology, if Natoli is correct, a jury would be entitled to rule in Plaintiff's favor. But a finder of fact is entitled to reject some or all of his opinions, leaving the record on summary judgment with genuine disputes of material fact for a jury to resolve.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's motion for summary judgment.

**SO ORDERED.**

Dated: October 17, 2022

J. Philip Calabrese
United States District Judge
Northern District of Ohio